IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SAM MONET,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>STATE OF HAWAII; GOVERNOR JOSH GREEN, in his official and individual capacity; DAWN CHANG, in her official capacity as Director of the Department of Land and Natural Resources,<br><br>　　　　　Defendants. | CIV. NO. 25-00392 JMS-WRP<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, ECF NO. 11 |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS, ECF NO. 11

### I.  INTRODUCTION

Defendants State of Hawaii; Hawaii Governor Josh Green ("Green"), in his official and individual capacity; and Dawn Chang ("Chang"), in her official capacity as Director of the State of Hawaii Department of Land and Natural Resources ("DLNR") (collectively, "Defendants"), move to dismiss the Complaint filed by pro se Plaintiff Sam Monet ("Plaintiff" or "Monet").  Based on the following, the Motion to Dismiss, ECF No. 11, is GRANTED.

### II.  BACKGROUND

The court assumes the well-pleaded allegations of the Complaint are true for purposes of this Motion to Dismiss.  *See, e.g.*, *Steinle v. City & County of*

*San Francisco*, 919 F.3d 1154, 1158 n.1 (9th Cir. 2019).[1]  Plaintiff's September 11, 2025 Complaint seeks declaratory and injunctive relief, as well as damages, arising from alleged violations of Hawaii statutes and regulations regarding the Ala Wai Harbor, located in Honolulu, Hawaii.  ECF No. 1 at PageID.2.

**A.    "Liveaboard Permits"**

According to the Complaint, Plaintiff has lived aboard his vessel at the Ala Wai Harbor since 2000, and has "modified and upgraded his property boat to meet habitability standards outlined in [Hawaii Administrative Rules ("HAR")], Title 13, Subtitle 11, Part 1, Chapter 231, § 13-231-26(a)."  *Id.* ¶ 2.[2]  The Complaint alleges that under Hawaii Revised Statutes ("HRS") § 200-9(b), "the

---

[1]  This background section summarizes the general factual and legal allegations of Plaintiff's 27-page Complaint for context, but it does not set forth all the Complaint's details. Other salient details are set forth in the discussion section to follow.

[2]  Rule 13-231-26(a) provides:

> A vessel owner who holds a valid regular mooring permit issued by the [DLNR] authorizing the owner to moor the owner's vessel in Ala Wai or Keehi small boat harbors may use that vessel as a place of principal habitation if the owner has applied for and secured a principal habitation permit issued by the [DLNR] in accordance with these rules, provided that the owner and the vessel meet the requirements set forth in these rules.

harbor is limited to 129 live-aboard vessels."[3]  *Id.* ¶ 3.  Accordingly, HAR 13-231-26(f) also limits "live-aboard" permits to 129.[4]  *Id.*

Plaintiff alleges that "[t]he live aboard system historically functioned for over 60 years effectively with a waitlist, ensuring that first on the waitlist should be granted a permit when the cap is not reached," *id.* ¶ 4, and that "Plaintiff has resided legally aboard his vessel in the [Ala Wai Harbor] paying double mooring fees, complying with all regulations."  *Id.*  But "in or about 2017 – 2018

---

[3]  Section 200-9(b) provides:

> Vessels used for purposes of recreational boating activities that are also the principal habitation of the owners shall occupy no more than one hundred twenty-nine berths at Ala Wai boat harbor and thirty-five berths at Keehi boat harbor, which is equal to fifteen per cent of the respective total moorage space that was available as of July 1, 1976, at the Ala Wai and Keehi boat harbors.

In this regard, HRS § 200-9 provides in part that:

> only vessels in good material and operating condition that are regularly navigated beyond the confines of the small boat harbor and that are used for recreational activities, the landing of fish, or commercial vessel activities shall be permitted to moor, anchor, or berth at a state small boat harbor or use any of its facilities.

[4]  Rule 13-231-26(f) provides:

> The owners of no more than one hundred twenty-nine vessels moored at Ala Wai small boat harbor shall be issued permits to use their vessels as a place of principal habitation.  The owners of no more than thirty-five vessels moored at Keehi small boat harbor may be issued such permits.  Any vessel used as a place of principal habitation that is temporarily absent from its mooring shall continue to be considered as one of the vessels being used as a place of principal habitation if the owner retains a principal habitation permit as provided in section 13-231-11.

the State of Hawaii, through the [DLNR], unilaterally suspended the issuance of new live aboard permits without legal or statutory authority." *Id.* ¶ 6. *See also id.* at PageID.11.

The Complaint sets forth several negative consequences that have occurred since the State has suspended issuance of liveaboard permits. *Id.* at PageID.2–3. These consequences include many persons who live on vessels in the harbor without permits, some of whom violate rules by, for example, allowing aggressive dogs to roam at night or using water and other facilities without paying fees. *Id.* at PageID.3. The Complaint alleges that some boaters have applied for liveaboard permits, and "rule-abiding [Ala Wai Harbor] tenants have been denied legal liveaboard status." *Id.* ¶ 10. In addition,

> DLNR selectively enforces rules, penalizing lawful tenants like Plaintiff who pay the additional live aboard fees while ignoring approximately 150 illegal liveaboards at [Ala Wai Harbor] who are thus allowed to occupy slips, use [Ala Wai Harbor] water and other boat support facilities without paying an extra live aboard fee or suffer any consequences or eviction for non payment. This cost the harbor approximately $1 million per year in lost revenue.

*Id.* ¶ 13. The Complaint alleges that "[t]oday there are fewer than 30 legal liveaboards, while approximately 150 vessels house illegal liveaboards." *Id.* at PageID.11 ¶ 59. "This creates a two-tiered system, denying legal tenants equal protection and penalizing compliance." *Id.* ¶ 61. The Complaint alleges that

4

"[t]his pattern of selective enforcement and regulatory evasion has created an environment of legal ambiguity, fear, and disparate treatment at Ala Wai Harbor, undermining public trust and exposing the State to liability."  *Id.* ¶ 12.

The Complaint generally explains that over the past decade the State has attempted to privatize the Ala Wai Harbor, and that mismanagement and the failure to require permits was part of a strategy to justify privatization:

> By reducing the number of legal liveaboards to fewer than thirty, while allowing illegal tenants to remain unregulated and untaxed, the State and DLNR employees manufactured the appearance of mismanagement and lawlessness to justify broader redevelopment proposals at the Legislature, violating their public service fiduciary [duty].

*Id.* at PageID.12 ¶ 69.  "Taken together, these steps reflect a deliberate institutional effort to defund, defame, and dismantle public harbor infrastructure in order to justify private concession-style redevelopment[,] a violation of its public trust obligations and statute."  *Id.* ¶ 71.  "Public opposition—including petition signatures, packed legislative hearings, and organized testimony by Plaintiff and others—has repeatedly halted these efforts."  *Id.* ¶ 72.  Plaintiff also claims that "he cannot or relocate his vessel without access to another liveaboard slip, effectively rendering it un-saleable, a regulatory taking."  *Id.* at PageID.4, ¶ 15.

The Complaint thus seeks to compel Defendants to reinstate the
issuance of liveaboard permits under HRS § 200-9, as well as damages related to
the State's failure to issue such permits.  *Id.* at PageID.26.

## B.     "Fuel Dock" and "Haul Out Yard"

The Complaint also "seeks relief from the illegal repurposing of [the
Ala Wai Harbor] maritime infrastructure, including the transformation of the Ala
Wai Harbor Fuel Dock into a [DLNR Division of Conservation and Resources
Enforcement] law enforcement office—at a cost of at least $215,450 in
public funds, without any building permits, and in violation of Hawai'i's
constitutional public trust doctrine." *Id*. at PageID.4 ¶ 17.  It further alleges that
"[t]he [Ala Wai Harbor] haul-out yard, once a cornerstone of boat maintenance and
small-scale marine industry, remains vacant and the soil contaminated.  Its former
use generated approximately $300,000 per year in income, now lost." *Id.* ¶ 18.  It
alleges that the "haul-out yard" has been mismanaged and has been "vacant and
soil contaminated for over 10 years." *Id.* at PageID.14 ¶ 92.  The DLNR now
leases the site to "Secure Parking which uses the site as an unpaved parking lot,
worsening environmental exposure to the public" and releasing "toxic dust
endangering public health and safety." *Id.* at PageID.15.  And, given the alleged
revenue losses, the Complaint alleges:

> As a direct consequence of DLNR's mismanagement and
> elimination of key revenue-generating facilities at Ala

6

> Wai Small Boat Harbor—including the long-term closure
> of the haul-out yard, the fuel dock, and the restriction of
> legal liveaboard tenants—Plaintiff is informed and
> believes the State Boating Special Fund suffered losses
> exceeding $15 million between 2017 and the present.
> These revenues had previously funded essential services,
> including the refloat, removal, and offshore disposal of
> sunken vessels.

*Id.* at PageID.4–5 ¶ 19.

The Complaint thus seeks to compel the State to "restor[e] harbor services including fuel dock and haul-out," as well as related damages. *Id.* at PageID.26.

## C.    HRS § 200-13.5

Plaintiff also claims that the State's loss of revenue (from the lack of fuel dock and haul out and liveaboard permit fees) and costs related to a March 4, 2024 grounding of an unpermitted commercial sailing vessel ("the Criterion") caused the State to begin or resume enforcement of HRS § 200-13.5, which requires "individual boaters to purchase private insurance for the refloat and disposal of their own sunken vessels in offshore waters." *Id.* at PageID.5 ¶ 20.[5]  In

---

[5] Section 200-13.5 provides in part:

(a) This section shall apply to:

(1) All owners of vessels originally manufactured with a
length of twenty-six feet or more that are:

(continued . . . )

7

particular, he alleges that "[i]n 2019, DLNR cited a lack of sufficient funds in the Boating Special Fund and urged the Legislature to enact HRS § 200-13.5, requiring individual boaters to purchase private insurance for the refloat and disposal of their own sunken vessels in offshore waters." *Id.* ¶ 20.  Years later,

> [o]n March 4, 2024 the 90 foot sailing vessel "Criterion" operating an unpermitted commercial tour service out of [Ala Wai Harbor] ran aground on the reef fronting Waikiki beach, resulting in a high-profile marine incident where lifeguards and Good Samaritans shuttled the 30 adult passengers ashore.

*Id.* ¶ 22.  "Immediately after the Criterion sinking, DLNR imposed HRS § 200-13.5, the new insurance requirement, it had not enforced for many years on

---

(A) Required to be registered pursuant to section 200-31(a); or

(B) Operated in state ocean waters with a valid documentation number from the United States Coast Guard; and

(2) Owners of vessels originally manufactured with a length of less than twenty-six feet who were or are the registered owner of a grounded vessel located anywhere in the State or state ocean waters.

(b) All owners of vessels subject to this section pursuant to subsection (a) shall obtain insurance coverage with a limit of not less than $100,000 per occurrence, in a form and content to ensure that removal and salvage of a grounded vessel are covered; provided that the vessel owner may provide alternative proof of insurance, approved by the department, to comply with this section.

boaters, including Plaintiff, across the state." *Id.* at PageID.6 ¶ 25.  And he claims that

> DLNR chose not to enforce this 2019 new insurance statu[t]e until immediately after the Cri[t]erion disaster, stating insufficient Special Boating funds, which shifted the cost of vessel salvage and disposal to all private boat owners, alleging that the Boating Special Fund lacked sufficient funds.

*Id.* ¶ 26.  "This legislative maneuver was a retaliatory and financially punitive response to a problem caused by the agency's own neglect and selective enforcement." *Id.* ¶ 27.  "The passage of HRS § 200-13.5, was neither necessary for public safety nor operational efficiency and failed to comply with Hawai'i's open government mandates under HRS §§ 92-1 and 92-41." *Id.* ¶ 28.

Accordingly, the Complaint seeks a declaration that § 200-13.5 is unconstitutional, and a prohibition on its continued enforcement "against Plaintiff and similarly situated liveaboard vessel owners." *Id.* at PageID.26.

**D.    Alleged Emails to and from Green**

According to the Complaint and documents attached to the Complaint, Plaintiff sent an email to DLNR officials and Green on January 11, 2025, complaining about the harbor issues set forth in the Complaint. *See id.* at PageID.6–7; ECF No. 1-5.  The email ended with

> Do the right thing Dr./Gov. Green.

> . . . .

> Josh and his cronies need to buck up, quit taking bribes
> from Hilton and Hughes and put the money into this
> harbor, a new haul ou[t], fuel and ice. Traditional
> facilities that support our public trust asset, which I
> firmly believe a court will order.

ECF No. 1-5. Plaintiff claims that Green responded to Plaintiff's email on January 12, 2025, from Green's personal email account stating "It's ugly you suggest corruption or bribes. It's not civil, not accurate or remotely acceptable. Don't include me if that is going to be your caustic and absurd rhetoric." ECF No. 1-6. Although it is unclear to what it responds, another alleged email from Green on January 13, 2025, states in part that "[s]uggesting violence needs to be reported. You'll be hearing from legal." ECF No. 1-7.[6] And Plaintiff alleges that, on January 14, 2025, Green sent Plaintiff an email stating as follows:

> I'm asking the new harbors people to be more supportive
> and find a solution. I can't micromanage this or other
> projects but I can get the best people on it.
>
> The local reps or senators need to drive it too.
>
> This email can't be used really for work and is for
> emergencies only.
>
> I'm bcc'ing the key parties at the top to start fixing this
> for your group.

---

[6] It is obvious that the Complaint is missing an email or other information to put the January 13, 2025 email in context. The email begins with "You spelled lose wrong," ECF No. 1-7, but there is no related content in Plaintiff's January 11, 2025 email.

10

> This will be my last direct email on this until they give
> me a solution that satisfies you and others.
>
> Some form of good compromise.

ECF No. 1-8.

Monet later sent a lengthy email to DLNR officials and others on June

3, 2025, regarding harbor issues.  ECF No. 1-9.  And sometime in August 2025, a

DLNR administrator sent Monet the following email:

> Aloha Sam,
>
> The Department has discussed your three requests for the
> Ala Wai SBH which were:
>
> 1. Re-Instate the liveaboards.
> 2. Bring back the haul out.
> 3. Bring back the fuel dock.
>
> After internal[] discussion, we will not reinstate the
> issuance of new liveaboards as the Hawaii Administrative
> Rules do not require us to do so.  As for #2 and #3, there
> are no funds to build a haul out or a fuel dock.

ECF No. 1-3.

Based on those responses from Green and other complaints Plaintiff

has apparently made to him, Plaintiff alleges that Green violated Plaintiff's

constitutional rights, unlawfully retaliated against him, and committed other torts

or violations of Hawaii law.  *See* ECF No. 1 at PageID.19–23, 25–26.  The

Complaint alleges that because Green is a licensed physician he "owed an

enhanced duty to act upon documented environmental risks, including reports of

toxic dust and hazardous waste from the former haul-out yard."  *Id.* at PageID.21

¶ 145.

**D.    Procedural History**

Plaintiff filed his "Verified Complaint" on September 11, 2025.  ECF

No. 1.  Given the general factual allegations set forth above, the Complaint

contains the following fourteen Counts, which sometimes overlap in their

requested relief:

- Count I: "Violation of Public Trust Doctrine"

- Count II: "42 U.S.C. § 1983: Civil Right Deprivation (Monell v. Dept. of Soc. Services, 436 U.S. 658)"

- Count III: "Equal Protection Violation" (U.S. Const. Amend. XIV; Village of Willowbrook v. Olech, 528 U.S. 562)"

- Count IV: "Unlawful Agency Action (Loper Bright v. Raimondo, 601 U.S. (2024))"

- Count V: "Retaliation for Protected Speech (Nieves v. Bartlett, 587 U.S. 391)"

- Count VI: "Regulatory Taking Without Just Compensation" (U.S. Const. Amends. V & XIV; Lucas v. South Carolina Coastal Council, 505 U.S. 1003; Henderson v. U.S., 575 U.S. 622)"

- Count VII: "Fee Discrimination and Selective Enforcement" (Equal Protection Clause – Financial Harm)"

- Count VIII: "Environmental Hazard and Misuse of Harbor Property, Declaratory and Injunctive Relief" (Like-Kind Use; Public Trust Doctrine)"

- Count IX: "Facial Challenge and Declaratory Relief re: HRS § 200-13.5 (Due Process, Equal Protection, Retaliation; 42 U.S.C. § 1983)"

- Count X: "Negligent Failure to Enforce Harbor Use Regulations Resulting in Unlawful Burden on the Public (HRS § 200-2, § 200-3, and Constitutional Equal Protection Violation)"

- Count XI: "Gross Negligence, Retaliation, and Breach of Public Duty (Against Defendant Josh Green, in his official capacity as Governor and licensed physician) 42 U.S.C. § 1983 and see Hope v. Pelzer, 536 U.S. 730 (2002)"

- Count XII: "Willful Neglect, Retaliation, and Abuse of Power (42 U.S.C. § 1983 and Hawaii Common Law)"

- Count XIII: "Intentional Infliction of Emotional Distress (IIED), (Punitive damages under § 1983)"

- Count XIV: "Civil Conspiracy to Violate Civil Rights (42 U.S.C. §§ 1985(3), 1986; 28 U.S.C. § 1983)"

*Id.* at PageID.15–24. The Complaint seeks declaratory and injunctive relief, as well as compensatory, punitive, and nominal damages. *Id.* at PageID.25–27.

Defendants filed a barebones Motion to Dismiss on October 2, 2025. ECF No. 11. Plaintiff filed his Response in Opposition on October 14, 2025, ECF No. 19, to which Defendants filed a Reply on November 3, 2025, ECF No. 24. Plaintiff was granted leave to file a Sur-Reply, which he filed on November 8, 2025. ECF No. 25-1. The court decides the Motion without a hearing under Local Rule 7.1(c).

# III.  DISCUSSION

## A.    The Eleventh Amendment Bars Damages Claims in Federal Court

Initially, Plaintiff's claims for damages directly against the State of Hawaii, and against Green and Chang in their official capacities, are barred by the Eleventh Amendment.[7]

"The Eleventh Amendment bars suits for money damages in federal court against a state, its agencies, and state officials acting in their official capacities." *Aholelei v. Dep't of Pub. Safety*, 488 F.3d 1144, 1147 (9th Cir. 2007) (citation omitted); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–03 (1984).  As to claims against a state itself, "[t]he Eleventh Amendment

---

[7] In his Opposition to Defendants' Eleventh Amendment immunity argument, Plaintiff states that he "Seeks Only Prospective Relief, Not Retrospective Damages," ECF No. 19 at PageID.142, and that "Plaintiff does **not** seek damages from the State treasury." *Id.* at PageID.143.  Even if Plaintiff is now abandoning claims for monetary relief, his Complaint plainly seeks compensatory, punitive damages, and "nominal" damages against some or all Defendants in both their individual and official capacities.  *See, e.g.*, ECF No. 1 at PageID.1 ("Verified Complaint for Declaratory Relief and Damages"), PageID.22 ("Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages against Defendant Green in both his personal and official capacity"), PageID.23 ("Plaintiff seeks punitive damages pursuant to *Smith v. Wade*, 461 U.S. 30 (1983)"), PageID.24 ("As a direct and proximate result of this conspiracy, Plaintiff has suffered and continues to suffer . . . Economic and reputational damage"), PageID.25 ("Plaintiff respectfully seeks: A. Compensatory damages . . ."); and PageID.25–26 ("Plaintiff seeks . . . compensatory and nominal damages . . . And the following: . . . H. Damages and Compensation for lost property value . . . . ; I. Damages and Compensation for reputational harm, and emotional distress to be determined at trial; J. Other Compensatory damages to be determined at trial; K. Punitive damages in an amount to be determined at trial").

Given these allegations, the court proceeds to explain why claims for damages against Hawaii and the official-capacity Defendants fail as a matter of law.

jurisdictional bar applies regardless of the nature of relief sought," absent

unequivocal consent by the state. *Krainski v. Nevada ex rel. Bd. of Regents of Nev.*

*Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010). "Hawaii has not

unequivocally waived its sovereign immunity, and Congress has not overridden

that immunity for civil rights actions brought pursuant to § 1983." *Thompson v.*

*Paleka*, 2017 WL 5309608, at *4 (D. Haw. Nov. 13, 2017) (citations omitted), *see*

*also, e.g.*, *Alba v. Halawa Corr. Facility*, 2025 WL 3687926, at *1 (D. Haw. Dec.

19, 2025) (reiterating Eleventh Amendment principles).[8]

  "A suit against state officials in their official capacities is the same as

a suit against the state itself and therefore is subject to the Eleventh Amendment."

*McNally v. Univ. of Haw.*, 780 F. Supp. 2d 1037, 1055 (D. Haw. 2011) (citing

*Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985)); *see also Will v. Mich. Dep't of*

---

  [8] Hawaii has waived its sovereign immunity as to torts of its employees. *See* HRS § 662-2. This waiver, however, only applies to suits brought in state court and, by itself, does not constitute a waiver of Eleventh Amendment immunity. *See McNally v. Univ. of Haw.*, 780 F. Supp. 2d 1037, 1059 (D. Haw. 2011). Similarly, although HRS § 661-1 waives immunity against claims based on violations of certain state statutes, regulations, and contracts, "this statute does not extend consent to suits in federal court." *Office of Hawaiian Affairs v. Dep't of Educ.*, 951 F. Supp. 1484, 1491 (D. Haw. 1996), *see also Fordyce v. City of Seattle*, 55 F.3d 436, 441 (9th Cir. 1995) ("Although [a state] may waive the protection of the Eleventh Amendment's jurisdictional bar by passing a statute consenting to be sued, a statute consenting to suit in state court does not constitute consent to suit in federal court.") (citations omitted). That is, Plaintiff's tort and other state-law claims for damages against the State of Hawaii and Defendants in their official capacities are also barred by the Eleventh Amendment. *See, e.g.*, *Pahk v. Hawaii*, 109 F. Supp. 2d 1262, 1268 (D. Haw. 2000). Moreover, "Hawaii has not waived its sovereign immunity from § 1983 damages liability." *Makanui v. Dep't of Educ.*, 6 Haw. App. 397, 406, 721 P.3d 165, 171 (Haw. Ct. App. 1986).

*State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the

official's office.") (citation omitted).  Put differently, neither a state nor its

employees acting in their official capacities is a "person" for purposes of § 1983.[9]

*Will*, 491 U.S. at 66.

   In sum, to the extent that Counts I, II, III, IV, V, VI, VII, VIII, X, XI,

XII, XIII, and XIV assert claims for damages against the State of Hawaii and

against Green and Chang in their official capacities (and to the extent they

otherwise state valid causes of action), such claims are barred by the Eleventh

Amendment and are DISMISSED.

**B. The *Ex Parte Young* Doctrine Does Not Apply, Given No Ongoing
  Violations of Federal Law**

   An exception to Eleventh Amendment immunity is the *Ex parte Young*

doctrine, which provides for suits for prospective injunctive relief against an

---

[9] 42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the
> District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a
> judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was
> unavailable.

appropriate state official in his or her official capacity when the suit seeks to

correct an ongoing violation of the Constitution or federal law. *See Ex parte*

*Young*, 209 U.S. 123, 159–60 (1908). Under *Ex parte Young*, requests for

declaratory and/or injunctive relief can only be brought against a state official in

his or her official capacity, not against the state entity. *See, e.g.*, *Nat'l Audubon*

*Soc'y, Inc. v. Davis*, 307 F.3d 835, 847 (9th Cir.), *opinion amended on denial of*

*reh'g*, 312 F.3d 416 (9th Cir. 2002) (holding "two state agencies [were] immune

from suit because they are state entities, not individual state officers.").

      Whether the *Ex parte Young* doctrine applies often turns on whether

the relief the plaintiff seeks is prospective, aimed at remedying an ongoing

violation of federal law, or is retrospective, aimed at remedying a past violation of

the law. *See, e.g.*, *Cardenas v. Anzai*, 311 F.3d 929, 935 (9th Cir. 2002). Moreover,

the doctrine only applies for ongoing violations of federal law—not for alleged

violations of state law. *See, e.g.*, *Pennhurst*, 465 U.S. at 106 (stating that "when a

plaintiff alleges that a state official has violated *state* law," then "the entire basis

for the doctrine of *Young* . . . disappears"); *Sherez v. State of Haw. Dep't of Educ.*,

396 F. Supp. 2d 1138, 1145 (D. Haw. 2005) ("[W]hen the allegedly illegal official

conduct violates state law only, the Supremacy Clause is not implicated; the

Eleventh Amendment, therefore, acts as a complete bar to the suit, regardless of the

remedy sought") (citing *Pennhurst*); *Nice v. Lopez*, 2025 WL 673454, at *4 (D.

Haw. Mar. 3, 2025) ("And to be clear, *Ex parte Young* does not apply, and cannot

be invoked, based on allegations of ongoing violations of *state* law.") (citing

*Pennhurst*).

Here, Plaintiff seeks equitable or injunctive relief, but not for viable

theories of ongoing violations of federal law or relief that is otherwise proper.

Plaintiff seeks "the reinstatement of liveaboard permits," and "an order restoring

harbor services including fuel dock and haul-out."  ECF No. 1 at PageID.26.  As an

initial matter, as this court reiterated in *Nice v. Lopez*, "courts have held that issuing

an injunction under *Ex parte Young* is generally impermissible where it would

control a state official's exercise of a discretionary function."  2025 WL 673454, at

*4; *see also Ex parte Young*, 209 U.S. at 158 ("There is no doubt that the court

cannot control the exercise of the discretion of an officer.  It can only direct

affirmative action where the officer having some duty to perform not involving

discretion, but merely ministerial in its nature, refuses or neglects to take such

action."); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 241 (5th Cir. 2020)

("[T]he present [*Ex parte Young*] injunction is impermissible because it would

control the Secretary in her exercise of *discretionary* functions."); *Elephant Butte

Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 611 (10th Cir. 1998)

(stating that *Ex Parte Young* does not permit courts to interfere with discretionary

acts unless the exercise of discretion violates federal law).  And for several reasons,

Plaintiff has not otherwise alleged a valid theory that the State's failure to issue
liveaboard permits or restore the "fuel dock and haul-out" harbor services was or is
a violation of federal law.

First, Plaintiff's theory that his constitutional rights are being violated
because the DLNR has allegedly imposed a moratorium on issuing liveaboard
permits is not actionable in federal court; it is plainly a generalized grievance—
especially where Plaintiff has such a permit but is complaining about alleged
consequences of such an alleged moratorium on others. *See, e.g.*, *Lujan v.
Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992) ("We have consistently held
that a plaintiff raising only a generally available grievance about government—
claiming only harm to his and every citizen's interest in proper application of the
Constitution and laws, and seeking relief that no more directly and tangibly
benefits him than it does the public at large—does not state an Article III case or
controversy."); *Lance v. Coffman*, 549 U.S. 437, 442 (2007) ("The only injury
plaintiffs allege is . . . precisely the kind of undifferentiated, generalized grievance
about the conduct of government that [courts] have refused to countenance in the
past."). And even as to alleged harm to himself personally, Plaintiff has not

articulated a valid theory that such harm could be a result of a due process or equal

protection violation in failing to issue permits to others.[10]

Second, Plaintiff's claim seeking to "[e]njoin the continued

application or enforcement of HRS § 200-13.5 against Plaintiff and similarly

situated liveaboard vessel owners," ECF No. 1 at PageID.26, also fails.  Section

200-13.5 simply requires owners of vessels 26 feet or more in length, subject to

certain exceptions, to obtain insurance coverage to ensure that removal and salvage

of a grounded vessel is covered.  Although Plaintiff generally alleges that § 200-

13.5 violates the due process and equal protection clauses of the U.S. Constitution

and is facially unconstitutional, he has not established any viable theory for the

section's unconstitutionality.  And, although federal maritime law might be

considered, Hawaii certainly has rational, substantial and legitimate reasons for

requiring insurance for vessels moored at Ala Wai Harbor to ensure removal in the

event of grounding.  *See, e.g.*, *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348

U.S. 310, 321 (1955) ("We, like Congress, leave the regulation of marine insurance

---

[10]  To the extent Plaintiff argues that the DLNR should be compelled to enforce the permit requirement against others, such relief would be barred because the government generally has discretion as to enforcement decisions.  *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." (collecting cases)); *City & County of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 1002 (9th Cir. 2015) ("[A]n agency's decision not to enforce is analogous to prosecutorial discretion, an arena in which courts have traditionally not interfered."); *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (reasoning that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation").

where it has been—with the States."); *id.* at 321 n.29 (reasoning that the contention

"that the Federal Constitution forbids States to regulate marine insurance, even

where Congress acquiesces or expressly consents. . . is so lacking in merit that it

need not be discussed"); *cf. St. Paul Ins. Co. v. Great Lakes Turnings, Ltd.*, 829 F.

Supp. 982, 984 (N.D. Ill. 1993) (reasoning, in a marine context, that when a "state

does possess a general regulatory scheme over insurance contracts, state law will

govern if the state has a substantial and legitimate interest in the furtherance of its

own laws in the dispute"); *Washington v. Fireman's Fund Ins. Cos.*, 68 Haw. 192,

199, 708 P.2d 129, 134 (1985) (analyzing whether a statutory classification in a

Hawaii insurance law is constitutional by applying a rational basis test).

   Third, Plaintiff's allegation in Count VI for a "regulatory taking"

plainly fails to state a cause of action. Plaintiff has not shown that he has met the

ripeness requirements for such a claim. *See, e.g., Suitum v. Tahoe Regional

Planning Agency*, 520 U.S. 725, 733–34 (1997) (explaining ripeness and

exhaustion requirements). And even assuming he had met such requirements, a

regulatory taking claim fails for a lack of any showing that Plaintiff has lost all

economically beneficial use of his vessel. *See, e.g.*, *Rancho v. City of Calistoga*,

800 F.3d 1083, 1090 (9th Cir. 2015 ("Supreme Court cases 'have long established

that mere diminution in the value of property, however serious, is insufficient to

demonstrate a taking.'") (quoting *Concrete Pipe & Products of Cal., Inc. v. Constr.*

*Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993)) (other citations omitted).

Finally, any other prospective injunctive relief sought in the Complaint would be based on alleged violations of State law (e.g., "Violation of Public Trust Doctrine," ECF No. 1 at PageID15; "Environmental Hazard and Misuse of Harbor Property," *id.* at PageID.16; "Negligent Failure to Enforce Harbor Use Regulations," *id.* at PageID.18; "Willful Neglect, Retaliation, and Abuse of Power, *id.* at PageID.21). Injunctive relief based on such state-law claims—which may also fail for other reasons—is also barred in this court under the Eleventh Amendment. *See, e.g.*, *Nice*, 2025 WL 673454, at *4 ("*Ex parte Young* does not apply, and cannot be invoked, based on allegations of ongoing violations of *state* law.") (citing *Pennhurst*).[11]

## C.    Individual Claims Against Green Also Fail

The Complaint also makes constitutional and other claims for damages against Green individually, i.e., in his personal capacity. *See* ECF No. 1 at PageID.22. Green argues, among other grounds for dismissal, that he is entitled

---

[11] Plaintiff's confusing theory of retaliation in violation of the First Amendment, even if it stated a valid cause of action (which it does not), would not be a basis to grant the prospective injunctive relief he seeks (reinstatement of liveaboard permits, restoration of facilities, invalidation of HRS § 200-13.5, remediation, prohibition against discriminatory enforcement of State law), because such relief would not be related to the alleged retaliation.

to qualified immunity (at least as to the federal claims under 42 U.S.C. § 1983) because the Complaint alleges no viable theory that he violated a constitutional or federal right of Plaintiff.[12]

"Qualified immunity shields government officials from liability under § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Rieman v. Vasquez*, 96 F.4th 1085, 1092 (9th Cir. 2024) (quoting *Benavidez v. County of San Diego*, 993 F.3d 1134, 1151 (9th Cir. 2021)).  To make that determination, courts "consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct."  *Id.* (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)).  If the answer to either question is no, then the official has qualified immunity.  Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[12]  Similarly to his Opposition, Plaintiff argues in his Sur-reply that qualified immunity does not apply because—contrary to some of the allegations of his Complaint—he is not seeking damages against any Defendant in their personal capacity.  *See* ECF No. 25-1 at PageID.169 (Sur-reply arguing that "Plaintiff has sued each named official **only in their official capacity**, seeking prospective relief to end continuing constitutional violations.  Because no personal-capacity damages are sought, the qualified-immunity defense is legally irrelevant and should be disregarded.").  Although Plaintiff appears to be abandoning any claims against Green in his personal capacity, the court proceeds to analyze why such allegations in the Complaint fail at this stage.

Here, there is no viable theory that Green, acting in his individual
capacity, violated a constitutional or federal right of Plaintiff. First, Plaintiff's
equal protection and due process theories fail as a basis for damages against Green
for the same reasons they fail as a basis for prospective injunctive relief.
Moreover, there is no indication that any of the alleged violations—e.g., a failure to
issue liveaboard permits, a failure to provide past harbor services, or a failure to
remediate environmental harm—involved personal decisions by Green. That is,
even if there were actionable equal protection or due process violations (which
there are not), the court agrees with Defendants' argument that a sufficient causal
connection between acts of Green and a violation of federal law is lacking. *See,
e.g.*, *Olson v. County of Grant*, 127 F.4th 1193, 1197 (9th Cir. 2025) (reiterating
that "third parties may only be liable for the constitutional violations of others
under Section 1983 if they are a supervisor, and '(1) they were personally involved
in the constitutional deprivation, or (2) a sufficient causal connection exists
between the supervisor's wrongful conduct and the constitutional violation'")
(quoting *Felarca v. Birgeneau*, 891 F.3d 809, 819–20 (9th Cir. 2018) (brackets and
some internal marks omitted)).[13]

---

[13] And to be clear, the Complaint makes no *individual* claims against Chang or any other
official of the DLNR.

Plaintiff's claims for retaliation against Green, although unclear, fare no better. "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "To establish a First Amendment retaliation claim, [a plaintiff] must show that: (1) he was 'engaged in a constitutionally protected activity'; (2) the [defendant's] actions 'would chill a person of ordinary firmness from continuing to engage in the protected activity'; and (3) 'the protected activity was a substantial or motivating factor' in the [defendant's] conduct." *Cheairs v. City of Seattle*, 145 F.4th 1233, 1246 (9th Cir. 2025) (quoting *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020)).

But, even assuming that Plaintiff's petitioning Green for relief about a matter of public concern is constitutionally protected activity, Plaintiff has not alleged that he was subjected to retaliatory actions that would "chill a person of ordinary firmness from continuing to engage in the protected activity." *Id.* Under that standard, Green's alleged emails to Plaintiff could not constitute retaliatory actions in violation of the First Amendment. Plaintiff accused Green of taking bribes, ECF No. 1-5, and Green allegedly responded that "[i]t's ugly you suggest corruption or bribes" and "[d]on't include me if that is going to be your caustic and absurd rhetoric," ECF No. 1-6. And Green's alleged statements that "[s]uggesting

25

violence needs to be reported," and "[y]ou'll be hearing from legal," ECF No. 1-7,

are simply not—as Plaintiff contends—"threat[s]" that Green would "call his

security."  ECF No. 19 at PageID.144; *see also* ECF No. 25-1 at PageID.169.[14]

Even assuming the Complaint's factual allegations are true, Green did

nothing constituting retaliation in violation of the First Amendment.  Plaintiff was

not, for example, prosecuted, arrested, silenced, or denied a benefit.  *See generally*,

*Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (reiterating that "the government

. . . may not deny a benefit to a person on a basis that infringes his constitutionally

protected interests—especially, his interest in freedom of speech").  Indeed, after

Plaintiff's email to DLNR officials and to Green that complained about harbor

matters, Green responded that he would "ask[] the new harbors people to be more

supportive and find a solution" and that he "cannot micromanage this or other

projects but . . . can get the best people on it."  ECF No. 1-8.  Green then told

Plaintiff he was "bcc'ing the key parties at the top to start fixing this for your

group."  *Id.*  And, according to the Complaint, on August 26, 2025, the DLNR

responded directly to Plaintiff, telling him that it had discussed requests to "Re-

Instate the liveaboards," "Bring back the haul out," and "Bring back the fuel

---

[14]  Again, it is obvious that the Complaint omits information that would provide the context for Green's alleged statements.  Green allegedly also responded that "you spelled lose wrong," when nothing like that was part of Plaintiff's January 11, 2025 communication.

dock," but explaining that "we will not reinstate the Issuance of new liveaboards as the Hawaii Administrative Rules do not require us to do so," and "there are no funds to build a haul out or a fuel dock."  ECF No. 1-3.[15]  Green was not involved and there is no basis for a First Amendment retaliation claim.  *See, e.g.*, *Olson*, 127 F.4th at 1197 (requiring a third party official to be a supervisor and "personally involved in the constitutional deprivation").  Accordingly, the court DISMISSES any claims under § 1983 against Green in his personal capacity.

Any remaining potential claims against Green for individual liability would be based (if at all) on state law (e.g., Count I—"Violation of Public Trust Doctrine"; Count VIII—"Environmental Hazard and Misuse of Harbor Property"; Count X—"Negligent Failure to Enforce Harbor Use Regulations"; Count XI— "Gross Negligence, Retaliation, and Breach of Public Duty"; Count XII—"Willful Neglect, Retaliation, and Abuse of Power"; and Count III—"Intentional Infliction of Emotional Distress").  Although these claims might otherwise fail as a matter of law, Defendants have not asserted such arguments in their Motion and state that the court "should decline to exercise supplemental jurisdiction."  ECF No. 11-1 at

---

[15]  Plaintiff cannot be asserting that the denial of his requests was itself the retaliation for his protected speech.  As Defendants point out, the August 2025 denial, i.e., the "retaliation," was the same result that occurred in 2017 and 2024, *before* his January 2025 email exchange. His complaints could not, without more, have been a "substantial or motivating factor" in such alleged "retaliation."  *Cheairs v. City of Seattle*, 145 F.4th 1233, 1246 (9th Cir. 2025).  A contrary result would mean an official could not deny such requests from members of the public without the denial being retaliatory.

PageID.99.  *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . .").

"[W]hen deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  And "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (quotation marks and alterations omitted).  Here, all federal claims have been dismissed, and the action has not proceeded past the motion to dismiss stage.  Accordingly, as to these remaining state-law claims, the court declines to exercise jurisdiction and DISMISSES them without prejudice.

## IV.  <u>CONCLUSION</u>

Even assuming the factual allegations of the Complaint are true, and assuming that Monet has reason to complain about certain conditions at the Ala Wai Harbor, he has not made out a federal case.  For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED.  Because further amendment would

be futile, the Complaint is dismissed without leave to amend.  *See, e.g.*, *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1243(9th Cir. 2023) ("Although leave to amend should be given freely . . . denying leave is not an abuse of discretion if 'it is clear that granting leave to amend would have been futile . . . .'") (quoting *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004)).  The clerk of court shall close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 13, 2026.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge